

ORIGINAL FILED 07 MAY 10 PM 3:58 RICHARD W. WIEKING CLERK, U.S. DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

Joseph J. Tabacco, Jr. (75484)
Christopher T. Heffelfinger (118058)
**BERMAN DEVALERIO PEASE TABACCO BURT& PUCILLO**
425 California Street, Suite 2100
San Francisco, California 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382

Christopher Lovell
Christopher M. McGrath
**LOVELL STEWART HALEBIAN LLP**
500 Fifth Avenue, 58th Floor
New York, New York 10110
Telephone: (212) 608-1900
Facsimile: (212) 719-4677

***Counsel for Plaintiffs***

[Additional Counsel Listed on Signature page]

E-filing

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

JCS

DAVID J. GRISMAN and CRAIG MILLER, individually and collectively, doing business as DAWG MUSIC, on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

YOUTUBE, INC., YOUTUBE, LLC and GOOGLE, INC.

Defendants.

C No. 07 2518

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

The representative Plaintiffs David J. Grisman and Craig Miller, individually and collectively, doing business as Dawg Music, on behalf of themselves and all others similarly situated, bring this action and for their Complaint, allege as follows:

## NATURE OF ACTION

1. Plaintiffs bring this action to put an end to the pervasive and willful copyright infringement of Defendants YouTube, Inc., YouTube, LLC (together "YouTube", which also

refers to Defendants' website YouTube.com) and Google, Inc. ("Google", and together with YouTube, "Defendants"), which own and operate the website YouTube.com. The Class Plaintiffs seek to represent are copyright owners whose proprietary content Defendants have copied, stored, and electronically disseminated, publicly displayed, or performed, in whole or substantial infringing part, without the authorization of the rights owners. Defendants are unlawfully reproducing and distributing - and profiting from - Plaintiffs' copyrighted works on a massive scale without license authority from, or payments to, Plaintiffs.

2. YouTube.com was founded in February 2005 and is one of the Internet's largest and most popular video sharing websites where users can upload, view, and share video clips.

3. Google purchased YouTube on November 13, 2006 for $1.65 billion. Google paid this amount for YouTube even though Google already had its own video sharing website (i.e., Google Video) in part because of YouTube's massive arsenal of misappropriated copyrighted material.

4. YouTube functions by permitting, encouraging, and enabling users to upload and share vast amounts of video content, including: television programs, copyrighted musical works; movies; sporting events, and other proprietary content, the exclusive rights to which are owned by the Class. YouTube not only "stores" user directed content in unmodified form; it engages in, encourages, and enables the unlawful copying, alteration, display, dissemination, and performance of Class members' intellectual property, and profits considerably as a result.

5. Defendants are pursuing a deliberate strategy of engaging in, permitting, encouraging, and facilitating massive copyright infringement on the YouTube website because the presence of large amounts of valuable intellectual property generates interest in that website, resulting in public and media attention and increased traffic, which, in turn, increases YouTube's advertising revenues and projected value.

6. Recent events have confirmed that Defendants are able to identify copyrighted material on the YouTube website. In fact, Defendants have removed such material so long as victims of Defendants' infringing conduct agree to pay Defendants to do so.

7. Plaintiffs and the members of the Class have been harmed by Defendants willful

acts. Absent judicial intervention, Plaintiffs and the Class will continue to be harmed by Defendants. For the foregoing reasons, and those set forth below, Plaintiffs seek injunctive and other equitable relief and damages.

**JURISDICTION AND VENUE**

8. This Court has subject matter jurisdiction over this action, which arises under the Copyright Act, 17 U.S.C. § 101 *et seq*., pursuant to 28 U.S.C. §§ 1331 and 1338(a) and (b). This Court has supplemental jurisdiction over the statutory and common law unfair competition law claims pursuant to 28 U.S.C. § 1367.

9. This Court has personal jurisdiction over Defendants because each Defendant's principal place of business is located in this Judicial District.

10. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 (b) and (c) and 1400(a) because each Defendant's principal place of business is located in this Judicial District.

**THE PARTIES**

11. Plaintiff David J. Grisman ("Grisman") is a noted mandolinist and composer of acoustic music and does business as Dawg Music. Grisman resides in Sonoma County, California and in this Judicial District. Grisman owns copyrighted musical works which have been reproduced by Defendants without his permission or authorization and without compensation.

12. Plaintiff Craig Miller ("Miller") is a resident of Los Angeles County, California. Miller is a co-owner of Dawg Music, a music publisher.

13. Plaintiff Dawg Music is a California general partnership owned and controlled by Grisman and Miller doing business in Marin County, California and in this Judicial District.

14. Among other works, Grisman and Miller own or control the relevant exclusive rights in the following musical compositions which are being infringed upon by Defendants. These works include, but are not limited to:

/ / /

/ / /

/ / /

| Title of Work | Registration Number | URL Where Infringing Work Found | Date Posted |
|---|---|---|---|
| | | | |
| EMD | Eu 699315 | http://www.youtube.com/watch?v=juwrbE4PO o | 8/10/06 |
| GRATEFUL DAWG | PA 533-027 | http://www.youtube.com/watch?v=2Ase4nOjvQ0 | 12/15/06 |

15. Defendant YouTube, Inc. is a corporation organized and existing under the laws of the State of Delaware and with its principal place of business at 1000 Cherry Avenue, San Bruno, California and in this Judicial District. YouTube, Inc. was founded in February 2005. YouTube launched the service challenged here on December 15, 2005.

16. Defendant YouTube, LLC is a limited liability company organized and existing under the laws of the State of Delaware and with its principal place of business at 1000 Cherry Avenue, San Bruno, California and in this Judicial District. YouTube, LLC is a wholly owned and controlled subsidiary of Google. YouTube, LLC is the successor in interest of YouTube, Inc.

17. Defendant Google is a publicly held corporation organized and existing under the laws of the State of Delaware and with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California and in this Judicial District. On November 13, 2006, Google closed is acquisition of YouTube for $1.65 billion dollars in stock. Google is a successor in interest to YouTube and is an active participant in YouTube's unlawful conduct and profits directly there from. Google exercises complete domination and control over YouTube and maintains a substantial, continuing connection with YouTube with regard to the infringing activities complained of herein

**CLASS ALLEGATIONS**

18. Plaintiffs bring this action on behalf of themselves, and all other similarly situated, pursuant to Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons and entities, from December 15, 2005 to the present, that own the copyright and/or the relevant exclusive rights in an original work ("Protected Works") that were unlawfully reproduced, adapted, distributed, publicly displayed, performed, or otherwise transmitted or disseminated on or through the YouTube.com website (the "Class"). Defendants, their subsidiaries and affiliates, any person or entity who is a partner, officer, director, employee, or controlling person of any Defendants, any entity in which any Defendant has a controlling interest, any copyright holder who has duly authorized Defendants to exercise the relevant exclusive rights at the time Defendants engaged in such acts, and the legal representatives, heirs, successors and assigns of any excluded party are not class members.

19. The members of the Class are so numerous that joinder of all members is impracticable. YouTube has approximately 20 million unique visitors viewing YouTube's website. Since July 2006, YouTube has reported in its press releases that its users view more than 100 million videos every single day. It is estimated that A January as much as 70 percent of the material on YouTube is copyrighted material uploaded to YouTube without the owners' consent.

20. Plaintiffs will fully and adequately protect the interests of all members of the Class. Plaintiffs have retained counsel experienced in complex class action and copyright infringement litigation. Plaintiffs have no interests which are adverse to or in conflict with other members of the Class.

21. Plaintiffs' claims are typical of the claims of the other members of the Class they seek to represent because they and all members of the Class were injured and continue to be injured in the same manner by Defendant's illegal acts and practices complained of herein, i.e., they have had their rights in Protected Works unlawfully reproduced and distributed by Defendants without Plaintiffs' permission and publicly performed and otherwise exploited in violation of their rights numerous times. Like other members of the Class, Plaintiffs require injunctive relief to prevent Defendants from continuing to infringe their exclusive rights and have sustained damages as a result of Defendants' wrongful conduct, entitling them to recover those damages or, at their election, recover statutory damages.

22. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, particularly where, as here injunctive relief is primarily sought. In addition, because damages suffered by some individual members of the Class, although not inconsequential, may be relatively small, the expense and burden of individual litigation make it

impracticable for Class members individually to seek redress for the wrongful conduct alleged herein. Should separate actions be required to be brought by each individual member of the Class, the resulting multiplicity of lawsuits would cause undue hardship and expense on the Court and the litigants. Plaintiffs anticipate no undue difficulty in the management of this litigation as a class action.

23. The members of the Class are reasonably ascertainable through methods typical of class action practice and procedure and through Defendants' own records.

24. A class action approach to the adjudication of this controversy is manageable. The benefits of adjudicating this controversy as a class action far outweigh any difficulties in managing the Class. Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate final injunctive relief with respect to the Class as a whole.

25. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

A. Whether Defendants' conduct as alleged herein constitutes direct infringement of the Protected Works held by Plaintiffs and the Class;

B. Whether Defendants conduct as alleged herein constitutes contributory infringement of the Protected Works held by Plaintiffs and the Class;

C. Whether Defendants' conduct as alleged herein constitutes vicarious infringement of the Protected Works held by Plaintiffs and the Class;

D. Whether Defendants' conduct as alleged herein constitutes "inducing" infringement by others of the Protected Works held by Plaintiffs and the Class;

E. Whether Defendants acted willfully with respect to the acts complaint of herein;

F. Whether Defendants have deliberately avoided taking reasonable precautions to deter infringement on YouTube.

G. Whether Defendants have the right and ability to control the infringing activities taking place on YouTube.

H. Whether Defendants derive direct financial and related benefits from the infringing activities taking place on YouTube;

I. Whether Defendants' conduct as alleged herein constitutes "storage at the direction of a user" of copyrighted material as that phrase is used in 17 U.S.C.§ 512 (c)(1);

J. Whether copyrighted materials displayed by YouTube "reside" on a system or

network controlled by Defendants as that term is used in 17 U.S.C. § 512(c)(1):

K. Whether Defendants have or had actual knowledge that the material or an activity using the material on their systems or networks is infringing;

L. Whether the defenses set forth in 17 U.S.C. § 512 or elsewhere in the Copyright Act are available to Defendants;

M. Whether Defendants promote, encourage, invite and/or induce the infringing activities at issue;

N. Whether injunctive relief is appropriate; and

O. Whether Plaintiffs and the Class are entitled to damages for Defendants' wrongful conduct as alleged herein, including (1) statutory damages; (2) monetary damages; (3) disgorgement of profits; (4) prejudgment interest; and (5) attorneys' fees and court costs.

## FACTUAL ALLEGATIONS

### A. YouTube's Website

26. YouTube is a popular website that enables users to upload, view, and share video and audio clips and other material. YouTube contains a wide variety of material, including video and audio clips from sporting events, movies, popular music, television shows, and music videos. Founded in February 2005, in its short time on the web YouTube has grown at an unprecedented rate and received a massive amount of media attention. YouTube is currently one of the fastest-growing websites in the world and accounts for approximately 46% of online video traffic. YouTube enables users to post and view material without charge, choosing instead to derive its profits in other ways, including form advertising revenues generated through the popularity of the website and projected value as a site, platform, or destination.

27. One of the primary drivers of traffic to the YouTube website is the ability of users to view popular commercial material such as popular music, sports broadcasts, music videos, concert footage, television programs, movies, and other mainstream media content and artistic works. Much of this content was created by artists and other individuals or entities who own the intellectual property rights to these Protected Works.

28. YouTube's content includes not only currently released infringing material, but also material that has not yet been released or authorized for broadcast through authorized distribution channels. YouTube thus serves as a well known source for obtaining unauthorized, pre-released

content.

29. Defendants are well aware of the infringing nature of the content YouTube provides depend on the appearance of such material to attract viewers and thereby create and enhance the value of its business. As an industry analyst has reported, "It's clear that YouTube has the ability (like their competitors) to filter out copyrighted materials right now, and they are choosing not to do so. That would gut YouTube's core content and that isn't gong to happen without a judge getting involved." See http://www.techcrunch.com/tag/YouTube/page/2/.

30. Defendants invite and encourage users to view, share, save, and post unauthorized copies of these works that are available for free on YouTube, but to upload additional content on YouTube, to enable millions of others to view it. These unauthorized and infringing copies are made and stored on computer servers owned and/or controlled by Defendants, in order to facilitate the further unauthorized copying, distribution, public display and performance of the works to as many users as possible. Each unauthorized copy of such work is made available to users for further unauthorized copying, distribution, public display, and performance at the click of a button or two, all without charge. Each unauthorized copy of such work is displayed in conjunction with the conspicuous appearance of the YouTube logo, as a "watermark" on the video image itself, and/or on the web page on which the video appears.

31. YouTube offers a number of features to users to enable the further unauthorized dissemination of these works, including the ability to "Save the Favorites," "Add to Groups," "Share" and "Post". These functions create additional unauthorized copies and/or electronically store, transmit, or propagate for access and viewing by others, content that infringes the rights of others, including the rights of Plaintiffs and Class members.

32. YouTube also provides a feature and software code that permits, encourages and enables users to "embed" transparently a player facility on virtually any other website in the world (such as a personal home computer page, blog, etc) to publicly perform that content, including infringing content. For each video uploaded on YouTube, YouTube provides the HTML "code" for any user to thereafter "embed" that video on another website (whether affiliated with YouTube or otherwise), whether or not a user requests that such HTML code be provided. In exchange for

voluntarily providing the means and facilities to "embed" videos in this manner, YouTube alters each such video so as to place its logo prominently on videos that are embedded on other websites.

33. YouTube allows its users to write "comments" on material displayed on the website, and those comments can be viewed by other users. A review of user comments linked to infringing content is notable for what it reveals about the extent that YouTube users expect to find and view unauthorized copies of copyrighted content.

34. User comments reveal that YouTube users expect to find a view unauthorized copies of copyrighted content and encourage and invite such activity by others. Such user comments also underscore the value that YouTube's place on accessing copyrighted content illegally and free-of-charge. User comments also reveal that the free availability of such copyrighted works on YouTube is a substitute for access to such works by legitimate means.

35. Google participates directly in the infringing activities on the YouTube website. Among other things, when a user accesses the "video search" function on Google's own website, the results returned from that search include, in substantial part, videos located on the YouTube website. By doing so, Google benefits by having YouTube provide it with infringing content accessible to users of the Google website, and in addition, Google directs is own users to the YouTube website to view infringing content found there.

**B. <u>Defendants' Infringement of the Protected Works</u>**

36. The owners of the Protected Works in this case control the exclusive rights in valid and subsisting copyrighted works protected under federal law and/or sound recordings protected under state law, by authorship or assignment.

37. For each of the Protected Works at issue, all statutory and other applicable formalities have been complied with and as to each, with the exception of sound recordings protected under state law, a certificate of registration has issued or the deposit, application and fee required for registration have been properly submitted to the U.S. Copyright Office (or will have been prior to the judgment in this case or will be found not to be required).

38. Each of the Protected Works at issue has been copies and electronically displayed and/or performed publicly, and/or otherwise disseminated, made available for downloading or

further electronic distribution or transmission via the YouTube website, in whole or substantial infringing part, without the authorization of the respective Plaintiff.

39. In addition to the specific instances of infringement set forth on Paragraph 12, infringement by Defendants of all the Protected Works has occurred and continues to occur in that videos that infringe Plaintiffs' and the Class' exclusive rights in their works have been and continue to be uploaded to YouTube, resulting in their reproduction, alteration, dissemination, public display, and public performance by (or facilitated or induced by) YouTube in violation of the Plaintiffs' exclusive rights.

40. For the length of time each infringing video was or is posted on YouTube and/or viewed or otherwise made available due to or in connection with such posting (and for some period thereafter, given that users can copy and further disseminate unauthorized copies of such works that appear on YouTube), Plaintiffs' and the Class' rights of reproduction, distribution, public performance, public display, preparation of derivative works, and/or to transmit digitally over the Internet were violated.

41. The infringed works specified herein are representative of Protected Works that are and have been infringed by Defendants and/or YouTube's users. The massive scale of the infringing acts at issue and the nature of the infringement – specifically, the fact that numerous infringing copies of Protected Works are posted daily, if not hourly – makes a full statement of each and every act of infringement in this Complaint unwarranted.

42. As alleged below, Defendants ensure that their infringing activity continues unrestrained by placing a number of insurmountable obstacles in the path of any copyright owner who attempts to monitor YouTube and identify removal of Protected Works.

C. **<u>Defendants' Refusal to Deter Infringing Activity</u>**

43. As alleged herein, Defendants have actual and constructive knowledge of the infringing activities occurring on the YouTube website. In addition, Defendants materially contribute to those infringing activities by, among other things, providing the means and facilities to infringe; inducing, encouraging, and facilitating infringement; providing functions designed to proliferate unauthorized copies of Protected Works, without the authorization of the rights owner;

and by enabling and encouraging users to engage in the unauthorized copying and dissemination of infringing copies of works.

44. Defendants have the right and ability to control the presence of infringing content on YouTube by various means, including through the use of widely-accepted filtering technologies, inhibit copyright owners for employing or utilizing them, or as alleged below, offer them only in exchange for licenses form content owners who are otherwise threatened by YouTube's continued (and massive) infringement of their copyrighted works. As alleged herein, Defendants have received and continue to receive direct financial benefit from such infringing content and activity.

45. Defendants pay lip-service to a purported desire to avoid violating intellectual property laws. In reality, however, they deliberately refuse to take meaningful steps to deter the rampant infringing activity readily apparent on YouTube (which would, in turn, have a negative impact on the advertising and other revenues and other value achieved through the large volume of traffic on the YouTube website).

46. Defendants have created a number of barriers that make it practically impossible and entirely impractical for owners of Protected Works to prevent Defendants' infringing activities. For example:

47. First, although Defendants state that copyright holders can submit "takedown notices" requesting removal of infringing material, Defendants are well aware that, in the case of YouTube, takedown notices are essentially meaningless. To begin with, it is extremely difficult for copyright holders (who have nowhere near the technological access of Defendants) to identify all of the different infringements of their copyrights taking place on YouTube. The only way for copyright holders to locate infringing activity is to use YouTube's "search" feature in an effort to canvas the millions of videos on the website in order to locate their Protected Works. As a result, in order to locate material that infringes their copyright, a Class member might have to construct countless "searches" designed to account for different names, titles, nicknames, and spellings that could be chosen by the users who uploaded the material. The scope of infringement is also a moving target, in that videos uploaded are not identified by copyright owner or registration

number, but rather by the uploader's choice of descriptive terms to describe the content of the video (typically referred to as "tags"), whether or not those "tags" bear any relation to the video uploaded or the work(s) that video infringes.

48. Even if a Class member were able - by sheer blind luck - to conceive of all possible search terms that might reveal the many infringements of the Class member's copyrights taking place on YouTube, it would not be enough. YouTube offers its users the ability to make any video that they upload "private." When a video is designated as "private," it can still be shared for free with certain designated users (*i.e.*, designated "friends" of the posting user) but it cannot be detected by YouTube's "Search" function. Thus, when users upload infringing videos and designate them as "private," it is impossible for copyright owners to locate such infringing videos so that they can identify them and/or send a "takedown notice" to YouTube. The "private video" feature, therefore, makes it impossible for anyone other than Defendants to assess accurately the amount of infringing works on the YouTube system, prevents copyright owners from accurately identifying all the works on YouTube that infringe their copyright interests, and demonstrates the futility of relying upon notice-and-takedown procedures to prevent infringement by Defendants and YouTube's users.

49. Furthermore, even if a Class member somehow did locate each and every infringement of their copyright on YouTube (including the "private" ones) and issued a proper "take down notice," it would still not be enough to prevent future infringement. Users can readily re-post such matter under different user and/or file names. This is a common practice, easily accomplished by users with even a modicum of computer skill, and a practice that Defendants make absolutely no effort to prevent.

50. Providing YouTube with written notice of specific infringements of works appearing on its website is futile: such notices do not prevent unauthorized copies of those same works from reappearing on YouTube thereafter.

51. Another example of Defendants' paying lip-service to a desire to respect intellectual property rights is their limitation of video clips to ten minutes. As Defendants are well aware, YouTube is frequently used to make available infringing copies of audiovisual works exceeding

the ten minute limit, which would include sporting events and feature length motion pictures, many of which are large national or international productions that are highly desirable to its users, particularly when they can be viewed at, "shared" by, or copied from, YouTube for free.

52. At some point, YouTube imposed a 10-minute clip limitation allegedly to inhibit this practice, but, as Defendants know, audio visual works, including feature length movies and other unauthorized, copyrights content continue to be frequently posted to YouTube in multiple, seriatim segments, easily circumventing the 10-minute clip limitation. Although the 10-minute length limitation on clips uploaded to YouTube does nothing to inhibit the posting, storage, dissemination, public display, and performance of infringing materials, as Defendants are aware, it does demonstrate that YouTube has actual an constructive knowledge that its services and facilities are being used for these unauthorized and infringing activities.

53. Defendants claim that they do not enable any downloading of copies to be made from the YouTube website, but any moderately experienced computer user can copy the material posted on YouTube to his or her computer with little difficulty and at virtually no cost.

54. Defendants' ability (but unwillingness) to control the infringing activities on the YouTube Website is further demonstrated by YouTube's ability to filter "offensive" and "pornographic" material from its website. YouTube claims that it actively polices its website to identify and remove "pornography, obscene or defamatory material," but refuses to take active steps to identify and remove blatant violations of the copyright laws.

55. Defendants induce others to infringe by offering the means and facilities to infringe, encouraging users to post and/or view infringing content on YouTube and use YouTube's various functions and features to further proliferate the unauthorized copying and dissemination of the copyrighted works of others, all as part of a deliberate scheme to increase the value of its business based on the presence of unauthorized and infringing copies of the copyrighted works of others.

**D. <u>Defendants' Financial Incentives to Violate the Class' Copyrights</u>**

56. Numerous media reports have recognized that YouTube's business model depends on copyright infringement. *See*, *e.g.*, Andrew Ross Sorkin, "Dot-Com Boom Echoed in Deal to Buy YouTube", <u>New York Times</u>, October 10, 2006. Indeed, it has been recognized that

Defendants are trying to garner licenses for some content because it knows that, if it implements any meaningful precautions to mitigate or prevent infringement, YouTube is going to lose popularity (and revenue).

57. The direct financial benefit to Defendants from these infringing activities has been enormous. In addition to the $1.65 billion dollars paid by Google for the YouTube business (which caused an increase in Google's stock price and thereby increased Google's market capitalization by billions of dollars), YouTube attracts potential revenue and enhances its value in other ways precisely because so many users are drawn by the availability of the highly desirable, infringing content that appears there. Internet sites depend on traffic and "eye-balls" because advertisers and others are interested in spending dollars on sites that offer the greatest potential reach. The huge volume of traffic that YouTube enjoys is generated in very substantial part by the infringing conduct at issue in this case. Accordingly, there is a direct causal connection between the infringing activities complained of and the financial benefits Defendants enjoy in their business. Defendants monetize the YouTube website, through, among other things, advertising and branding arrangements (both now and in the future) with existing and potential advertisers and content partners, which are designed to (and do) convert the substantial draw or "eye-balls" reaching YouTube, because of the infringing activity taking place there, into cash and financial benefits. For example, YouTube runs advertisement banners on top of every video clip, including clips that infringe on the copyrights of others. YouTube also created a daily "Participatory Video Ad" on its opening page which is estimated to bring in about $175,000 per day and has entered into long-term promotional agreements with companies, such as Cingular, each of which is estimated to be worth several millions of dollars. The more users Defendants can attract to YouTube, the more revenue the website generates from advertising and other uses of the site.

58. Defendants recently announced that YouTube is developing a business model to share advertising revenue with YouTube's users, which will in effect reward and encourage more infringement.

**E. <u>YouTube's "Strategic Partnerships"</u>**

59. Instead of taking any meaningful steps to thwart the pervasive copyright

infringement occurring on YouTube, and faced with the threat of lawsuits from some of the largest media and entertainment companies in the world, YouTube began entering into so-called "strategic partnerships" with several major media companies. These "strategic partnerships" provided that YouTube would promote these companies' programming and/or pay them royalties and licensing fees in exchange for agreements that these companies would not pursue legal action against YouTube for its past infringement of their copyrighted material. Essentially, YouTube's strategy has been to compensate only those copyright owners that it believes actually have the financial wherewithal to pursue legal remedies against it, while continuing to take the material of numerous other creators as well as smaller media, entertainment, and other content-creating companies, who are less able to bring their own lawsuits. Along the same lines, Google, upon the consummation of its acquisition of YouTube, opted to reserve at least $200 million from the $1.65 billion it paid for YouTube to fund a litigation war chest that it intends to use to repel legal actions by those less-resourced owners of Protected Works, instead of eliminating those Protected Works from the YouTube website.

60. To date, YouTube has entered into "strategic partnerships" with certain large media entities. Upon the consummation of the deals with each of these entities, YouTube issued joint press releases discussing the terms of the deals. The statements made by YouTube and these partners in the press releases establish that: (1) YouTube is fully aware that it is committing copyright infringement on a massive scale; (2) YouTube has the ability to identify such infringing material; (3) YouTube has the technology to monitor viewership on its website and pay copyright owners appropriate royalties; (4) YouTube has technology that is far superior to what it currently offers to copyright holders (other than its "strategic partners") for searching and identifying copyrighted material on its website; and (5) YouTube is willing to make its technology for filtering and/or identifying copyrighted material available only to companies that it believes have the wherewithal to pursue an individual lawsuit.

61. YouTube has offered to some prospective licensors of content that YouTube would adopt technological steps to prevent or mitigate the infringing content on its website if, but only if, the content owner agreed to license its content to YouTube. *See* Kenneth Li, "YouTube Anti

Piracy Software Policy Draws fire," Reuters, Feb. 16, 2007 In doing so, YouTube has sought illegally to leverage its position by offering "protection" from wholesale legal violations only on terms acceptable to YouTube. If a content owner fails to conclude a negotiation with YouTube, its content remains "unprotected," *i.e.*, it continues to remain exposed to YouTube's massive appetite for the unauthorized exploitation of copyrighted content. And, for those Class members too small or powerless or who choose not to do business with somebody who has profited by misappropriating their property, YouTube has made no offer to "protect" or implement technological steps to prevent or mitigate infringement. It is for protection of such victims that this case is being pursued.

62. Defendants' business practices of offering some form of content "protection" only to parties who agree to license their content to YouTube not only leaves rights holders unwilling to negotiate in such an environment exposed to the continuing threat of YouTube's unremitting infringement, but forces parties to grant licenses on terms which - absent the threat posed by YouTube's conduct - would be more commercially advantageous to such rights holders.

63. YouTube's conduct encourages and induces further infringement by users and rewards a business model that ultimately depends on infringement.

64. Unless and until Defendants take meaningful steps to prevent or mitigate the appearance of unauthorized copies of copyrighted works on the YouTube website through the technologies available to them, and/or change YouTube's business model, infringement of Protected Works will continue by and through the sponsorship of YouTube, in an continuous and widespread fashion.

**F. <u>Section 512 Defense is Unavailable to Defendants</u>**

65. Defendants purport to rely on the "notice and takedown" and qualified "safe harbor" provisions of 17 U.S.C. § 512 ("§ 512"), by claiming that YouTube is, in effect, a passive intermediary which merely hosts video and other content posted by users and that it is vigilant in responding to, and removing, any infringing content that is brought to its attention through formal written notices in compliance with the provisions of that statute.

66. Defendants do not qualify for any of the limitations on remedies - the so-called

limited "safe harbors" - set forth in § 512 for numerous reasons, including without limitation the following:

67. Defendants are not merely "storing" infringing content at the direction of a user. Certain of Defendants' activities are not user-directed. They provide various features, functions and facilities to further save, share, and otherwise disseminate such content. Defendants encourage and enable - and profit handsomely as a result. Defendants impose YouTube's own watermark/logo on the content; make that content available through "private" sharing facilities to members of the public for viewing in a manner that is not detectable by the copyright owner; and provide computer code to "embed" direct access to YouTube's facilities in other websites on the Internet, to enable further unauthorized public performance, display, and copying in other locations on the Internet that are not part of a system or network controlled or operated by or for Defendants. Defendants take multiple voluntary acts to encourage and/or facilitate infringing activity, including (without limitation) by creating, on behalf of users, the HTML code necessary to "embed" videos on other web sites.

68. Defendants further have failed to adopt and reasonably implement a policy pursuant to which YouTube terminates subscribers and account holders who are repeat infringers. In addition, and notwithstanding their representations to copyright owners that once YouTube receives a formal notice of infringement with respect to a particular work, that Defendants will prevent that work from re-appearing on YouTube, they have not done so. Defendants' representation to intellectual property rights' owners that they will prevent the re-appearance of specifically identified infringement on the YouTube website is false.

69. As YouTube presently operates, sending it notices to demand removal or "takedown" of infringements on its website is futile. Defendants have failed to police YouTube for the appearance and re-appearance of infringing material, including material that has been the subject of written notices by intellectual property owners, have not provided any effective means to receive and process notices, and have not responded expeditiously to remove infringing content when they do acknowledge receiving notices.

70. Defendants have available certain technical measures that are readily available to

prevent or mitigate infringement. Defendants should be estopped to deny the availability or value of such measures in assessing its obligations to prevent or mitigate infringement.

71. Defendants' failure to adopt such technical measures is willful and knowing and materially contributes to, causes, encourages, promotes, and induces the infringing conduct complained of herein.

72. The existence and availability of such technical measures and Defendants' willful and knowing decision not to implement them demonstrate a right and ability to control the infringing activities complained of herein, from which Defendants derive direct financial benefits.

73. Defendants' false representations about their compliance with applicable law and their failure to police YouTube and take meaningful steps to prevent or mitigate infringing activity are all deliberate and knowing elements of a strategy to maximize the financial and other benefits accruing to Defendants from the presence of such infringing activity on YouTube.

74. Defendants have actual knowledge of the widespread infringing activity on their system, and have cast a blind eye toward the constant and unremitting "red flags" of infringing activity that occur constantly on YouTube.

**G. <u>Harm to the Class</u>**

75. The harm to Plaintiffs and the Class caused by Defendants' acts is substantial and, to a large extent, irreparable. Plaintiffs and the Class not only lose the ability to control the delivery, manner, and means by which their respective works are made available to the public, but also lose revenue, directly and indirectly, by the substitution of unauthorized "free" viewing and copying on YouTube, which displaces legitimate sales through authorized channels of distribution and exhibition. In addition, the uncontrolled, "viral" availability of the Class members' content, without any meaningful protection against copying and proliferation, works to interfere with authorized licensing and marketing of these works, and jeopardizes Class members' ability to derive revenue from the valuable intellectual property each owns or controls.

76. Defendants have effectively arrogated to themselves, without authorization, a new "platform" for the delivery of the proprietary content of others and have drawn an unprecedented audience from which Defendants extract numerous financial and related benefits for YouTube's

business, the core of which depends upon making available highly desirable intellectual property without authorization from, or payment to, the rights owners. Defendants have effectively reversed the operating principles of applicable law by appropriating proprietary content first, without authorization, and seeking out licensing arrangements from relevant content owners only after complaints or demands are lodged against YouTube.

77. Defendants' conduct is causing, and unless enjoined by this Court, will continue to cause Plaintiffs and members of the Class irreparable injury that cannot be fully compensated or measured in money damages. Plaintiffs and members of the Class have no adequate remedy at law.

**FIRST CLAIM FOR RELIEF**

**(Direct Copyright Infringement - Against All Defendants)**

78. Plaintiff re-alleges and incorporates by reference all of the allegations of this Complaint with the same force and affect as if fully restated herein.

79. Defendants' enumerated conduct is a direct copyright infringement of the Protected Works.

80. The infringement of each such work is a separate and distinct act of infringement.

81. The foregoing acts of infringement by Defendants are willful, intentional, and purposeful and in disregard of and indifference to the rights of Plaintiffs and the Class members.

82. The foregoing acts constitute direct infringement of the exclusive rights in Protected Works.

**SECOND CLAIM FOR RELIEF**

**(Contributory Copyright Infringement - Against All Defendants)**

83. Plaintiff re-alleges and incorporates by reference all of the allegations of this Complaint with the same force and affect as if fully restated herein.

84. Defendants provide the site, means, and facilities for massive copyright infringement of Protected Works that takes place each time an unauthorized copy of such a work is copied and uploaded to YouTube, images from that work are publicly-displayed on YouTube, and each time a user accesses and streams, publicly performs, copies, forwards or otherwise transmits

such work. Each and every one of these infringements is encouraged, and made possible and facilitated by Defendants.

85. Such acts have been undertaken with full knowledge, actual and constructive, of the infringing activities alleged herein.

86. The infringement of each such work is a separate and distinct act of infringement.

87. The foregoing acts of infringement by Defendants are willful, intentional, and purposeful and in disregard of and indifference to the rights of Plaintiffs and the members of the Class.

88. The foregoing acts constitute contributory infringement of the exclusive rights in Protected Works.

**THIRD CLAIM FOR RELIEF**

**(Vicarious Copyright Infringement - Against All Defendants)**

89. Plaintiffs re-alleges and incorporates by reference all of the allegations of this complaint with the same force and affect as if fully restated herein.

90. Defendants have the right and ability to control the infringing activities alleged herein.

91. Defendants derive direct financial and related benefits from the infringing activities alleged herein.

92. The infringement of each of the Protected Works is a distinct act of infringement.

93. The foregoing acts of infringement by Defendants are willful, intentional, and purposeful and in disregard of and indifference to the rights of Plaintiffs and members of the Class.

94. The foregoing acts constitute vicarious infringement of the exclusive rights in Protected Works.

**FOURTH CLAIM FOR RELIEF**

**(Inducing Copyright Infringement - Against All Defendants)**

95. Plaintiffs re-alleges and incorporates by reference all of the allegations of this complaint with the same force and affect as if fully restated herein.

96. Defendants have infringed Protected Works by inducing others to reproduce, adapt,

distribute, and publicly perform or display and otherwise transmit those works.

97. The infringement of each such work is a separate and distinct act of infringement.

98. The foregoing acts of infringement by Defendants are willful, intentional, and purposeful and in disregard of and indifference to the rights of Plaintiffs and members of the Class.

99. The foregoing acts constitute inducing copyright infringement of the exclusive rights in Protected Works under applicable law.

**WHEREFORE**, Plaintiff and the Class request as follows:

1. That this Court declare, adjudge, and decree this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein:

2. That this Court award Plaintiffs, including all Class members, injunctive and other equitable relief, in accordance with the provisions of Rule 65 of the Federal Rules of Civil Procedure, enjoining Defendants, their officers, agents, servants, employees and attorneys, and all those in participation with them or any of them who receive actual notice of the Court's injunctive order:

A. from directly or indirectly reproducing, adapting, distributing, publicly displaying or performing or otherwise infringing in any manner any of the Protected Works, including but not limited to the works identified herein, or any work in which any member of the Class owns or controls the exclusive rights in valid and subsisting copyrighted works and/or sound recordings protected under state law, which is now in existence;

B. from causing, contributing to, inducing, enabling facilitating or participating in the infringement of any of the works referred to in Paragraph A, above;

C. from displaying Defendants' logos, or any colorable versions thereof, in connection with any unauthorized copies, public displays or performances, or other transmission, dissemination or exploitation of any of the works referred to in Paragraphs A and B, above;

D. affirmatively to adopt, implement and offer to all persons, those technological measures that are now, and shall be in the future, available, including but not limited to those technologies developed pursuant to a broad consensus of copyright owners and service providers in the relevant industries without unnecessarily substantial costs or burdens on their

system(s), to identify and protect copyrights content and prevent it from being posted or otherwise made available through the facilities owned and/or operated or controlled by Defendants; and

E. awarding such other equitable relief as will protect the members of the Class' rights to their copyrighted content and any exclusive rights in sound recordings protected by state law, including imposing a constructive trust on all the assets of Defendants, if necessary, to secure to the Class the benefits that the Constitution and Congress have promised them;

3. That this Court award Plaintiffs' damages and Defendants' profits attributable to their infringing acts, and/or statutory damages, as applicable, in the maximum amount permitted by law;

4. That this Court order disgorgement of all profits, direct and/or indirect, illegally gained;

5. That this Court award punitive damages on all sound recordings protected by state law, as permitted by law;

6. That this Court find Defendants jointly and severally liable for all damages awarded;

7. That this Court grant Plaintiff and the Class the actual costs in prosecuting this action, together with interest and reasonable attorney's fees and costs;

8. That this Court grant such further and other relief as this Court deems just and proper.

Dated: May 10, 2007

Respectfully submitted,

Christopher T. Heffelfinger

Joseph J. Tabacco, Jr.
**BERMAN DEVALERIO PEASE TABACCO BURT& PUCILLO**
425 California Street, 21st Floor
San Francisco, California 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
***Local Counsel for Plaintiffs***

Christopher Lovell
Christopher M. McGrath
**LOVELL STEWART HALEBIAN LLP**
500 Fifth Avenue, 58th Floor
New York, New York 10110
Telephone: (212) 608-1900
Facsimile: (212) 719-4677

Jeffrey L. Graubart
**LAW OFFICES OF JEFFREY L. GRAUBART**
350 West Colorado Boulevard, Suite 200
Pasadena, California 91105-1855
Telephone: (626) 304-2800
Facsimile: (626) 304-2807

Steve J. D'Onofrio
**D'ONOFRIO & ASSOCIATES**
5335 Wisconsin Avenue, N.W. Suite 950
Washington, D.C. 20015
Telephone: (202) 686-2872
Facsimile: (202) 686-2875

***Counsel for Plaintiffs***